```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,        )
 4                                    )
                     Plaintiff,       )
 5                                    )    No. 18 CR 286
             vs.                      )    Chicago, Illinois
 6                                    )    July 15, 2020
     DAVID SALGADO,                   )    1:30 p.m.
 7                                    )
                     Defendant.       )
 8

 9             TRANSCRIPT OF PROCEEDINGS - SENTENCING

10          BEFORE THE HONORABLE MATTHEW F. KENNELLY

11   APPEARANCES:
     For the Plaintiff:         HON. JOHN R. LAUSCH, JR.
12                              United States Attorney
                                219 South Dearborn Street
13                              Chicago, Illinois 60604
                                BY:  MR. ANKUR SRIVASTAVA
14                                   MR. SEAN J.B. FRANZBLAU

15
     For the Defendant:         PETRO & ASSOCIATES
16                              53 W. Jackson Blvd, Suite 630
                                Chicago, Illinois 60604
17                              BY:  MR. MICHAEL J. PETRO
                                     MS. BROOKE BUICAN
18

19   ALSO PRESENT:

20   Ms. Meredith Clifton, US Probation
     Ms. Petra Salgado
21   Ms. Kimberly Arreola

22
     Official Court Reporter:   JENNIFER S. COSTALES, CRR, RMR
23                              219 South Dearborn Street
                                Room 1706
24                              Chicago, Illinois 60604
                                (312) 435-5895
25                              jenny.uscra@yahoo.com
```

| | |
|---|---|
| 1 | (Proceedings in open court) |
| 2 | THE CLERK:  18 CR 286-2, USA versus Salgado. |
| 3 | THE COURT:  So we're following a little bit different |
| 4 | rules than we did the last time.  Number one is you guys are |
| 01:34:43  5 | sitting too close to each other.  So Ms. -- no, no.  She can |
| 6 | move down to the end of the table.  That will solve it.  And |
| 7 | then maybe if you, yeah, just move one seat to your left, |
| 8 | Mr. Salgado.  Thanks. |
| 9 | MR. PETRO:  Do you want me to sit here, Judge? |
| 01:34:57  10 | THE COURT:  No, no.  You're fine right there.  It's |
| 11 | all good. |
| 12 | Okay.  So the rule is going to be you take your mask |
| 13 | off only when you are talking. |
| 14 | MR. PETRO:  Okay. |
| 01:35:03  15 | THE COURT:  And since I am talking, mine is off. |
| 16 | So first order of business is does the government |
| 17 | have any objections or corrections to anything in the |
| 18 | presentence report? |
| 19 | And we are just going to use the mics at the tables |
| 01:35:15  20 | too so you don't have to approach the podium. |
| 21 | MR. FRANZBLAU:  Judge, just the objections that I |
| 22 | filed, that the government believes the two-level loss |
| 23 | enhancement applies for group one. |
| 24 | THE COURT:  But put aside guideline issues. |
| 01:35:27  25 | MR. FRANZBLAU:  Oh, I'm sorry. |

| | | |
|---|---|---|
| | 1 | THE COURT:  No.  My mistake.  I didn't specify. |
| | 2 | MR. FRANZBLAU:  Excuse me.  No, no. |
| | 3 | THE COURT:  Okay. |
| | 4 | So, Mr. Petro, have you read the presentence report |
| 01:35:37 | 5 | and discussed it with Mr. Salgado? |
| | 6 | MR. PETRO:  Yes, I have, Judge.  Thank you. |
| | 7 | THE COURT:  Mr. Salgado, did you -- you're fine -- |
| | 8 | Mr. Salgado, did you read the presentence report and discuss |
| | 9 | it with your lawyer? |
| 01:35:44 | 10 | THE DEFENDANT:  Yes. |
| | 11 | THE COURT:  Okay.  And, Mr. Petro, aside from |
| | 12 | guideline issues, do you have any objections or corrections to |
| | 13 | anything? |
| | 14 | MR. PETRO:  I do not, Judge. |
| 01:35:50 | 15 | THE COURT:  Okay.  So let's talk about then the |
| | 16 | guideline issues.  And just let me get something to write on. |
| | 17 | So I know we have an issue regarding the loss amount.  Not |
| | 18 | necessarily in this order, we have an issue regarding the role |
| | 19 | in the offense enhancement.  We have an issue regarding the |
| 01:36:10 | 20 | obstruction enhancement.  I believe there is an issue |
| | 21 | regarding grouping of counts. |
| | 22 | MR. FRANZBLAU:  Correct. |
| | 23 | THE COURT:  And I think that's it, but I'm not a |
| | 24 | hundred percent positive. |
| 01:36:21 | 25 | Mr. Petro, do you think that covers all the guideline |

1       issues we have to discuss?

2               MR. PETRO:  There was one issue that you ruled on in

3       Sergeant Elizondo's hearing.

4               THE COURT:  All right.  You get a separate hearing on

01:36:33   5    that.  I mean it.  So, I mean, you weren't --

6               MR. PETRO:  It had to do with sophisticated means.

7               THE COURT:  Sophisticated means, right, that was the

8       fourth issue.  I'm not -- yeah, unless you are going to make

9       other arguments about that.

01:36:48  10             MR. FRANZBLAU:  I'm going to withdraw that argument.

11              THE COURT:  Okay, fine.  So I'm finding the

12      sophisticated means enhancement doesn't apply, which is what I

13      think Probation recommended.

14              I forgot to give the Probation officer a chance to

01:36:53  15    give her name.  I apologize.

16              PROBATION OFFICER:  Good afternoon, Your Honor.

17      Meredith Clifton on behalf of Probation, standing in for Laura

18      Donahue.

19              THE COURT:  Thanks.  Okay.

01:37:00  20            So let's talk about loss amount first.  So I'll hear

21      first from Mr. Franzblau and then from defense counsel.

22              MR. FRANZBLAU:  Thank you, Judge.

23              So the issue here is whether the government can show

24      by a preponderance that the loss in this case in the aggregate

01:37:17  25    exceeded $6500.

1       Right off the bat, from the rental vehicle search we

2   have $4200.  So that gets us well beyond halfway there.  And

3   then if we look to the Maplewood search, the first undercover

4   operation, all the Court would have to determine is that the

01:37:34   5   defendants intended to take a similar amount of money or

6   similar proportion of the total amount that they recovered in

7   order to meet the $6500 threshold.

8       And the evidence is strong that they intended to take

9   at least the same proportion, which was about 20 to 25

01:37:52   10   percent.

11      As I talked about in the last sentencing hearing,

12   I'll be more brief this time, but we look to the dialogue with

13   Cuba.

14      THE COURT:  At least 25 percent of, what was the

01:38:02   15   overall amount?

16      MR. FRANZBLAU:  The overall amount --

17      THE COURT:  That was there, in other words present.

18      MR. FRANZBLAU:  -- in the Maplewood search was

19   $15,000.

01:38:11   20      THE COURT:  Got it, got it, okay.

21      MR. FRANZBLAU:  So all the Court would have to find

22   is that they intended to take about 20 percent of that, and

23   you would get above what we need.

24      THE COURT:  Okay.

01:38:21   25      MR. FRANZBLAU:  And, Judge, we know that they did

01:38:41

intend to take a very substantial amount of that cash.  You
look to the dialogue with Cuba in the initial recording when
Cuba tells Elizondo and Salgado that he was making $800 a day
from the marijuana that he received from the fictional drug
dealer that he told them lived in this apartment, and Elizondo
told him, "Look, we know we have to make it worth your while
and compensate you for that lost income," basically telling
him we're going to give you substantially more than what you
get per day out of that place.

01:38:54

We also know from the recorded conversation a week
after the search in which Elizondo tells Cuba that he and
Salgado intended to take enough to make it a good Christmas
for everyone, meaning Cuba, Davis, Elizondo and Salgado.

01:39:18

So they were going to split proceeds four ways in an
amount that was substantial enough for each person to get, you
know, a fair amount, enough to make it a good Christmas.  So
that certainly would seem to be at least in the couple of
thousands of dollars.

01:39:34

Even without the Maplewood search, we easily meet the
6500 threshold based on Gipson and Davis's testimony about the
cash that Elizondo and Salgado were distributing to them
throughout the course of the conspiracy.  The jury plainly
rejected the argument that is ridiculous on its face that
Elizondo was paying them out of pocket when he had free public

01:39:55

funds available to do the same thing.

1           They both testified that -- excuse me, Gipson and

2  Davis testified that together they received about $5500 in

3  cash during the course of the conspiracy.

4           And then on top of that we have the street value of

01:40:10   5  the cigarettes and the drugs that Elizondo and Salgado

6  distributed to Davis and Gipson alone.  And as I lay out in

7  detail in my sentencing memorandum, that had a street value of

8  at least $1500, and that's a very conservative estimate.

9           So we hit the 6500 easily and in multiple different

01:40:32  10  ways.

11           THE COURT:  Thanks.

12           Mr. Petro.

13           MR. PETRO:  Thank you, Judge.

14           I just want to start out, the standard is *United*

01:40:42  15  *States versus Bradley*, 628 F3d 394.  "Due process" -- and this

16  is a 2010 case from the Seventh Circuit.  "Due process

17  requires that sentencing determinations be based on reliable

18  evidence rather than speculation or unfounded allegations."

19           And then they repeat it in *United States versus*

01:41:04  20  *Clinton* in 825 F3d 809.  "A sentencing enhancement cannot be

21  based on mere speculation."

22           And what the government has provided here today,

23  Judge, is mere speculation.  They say words like "easily meet"

24  and that the street value "conservatively estimated."  And all

01:41:26  25  it is is puffing, Judge.  I don't know what drugs that they're

talking about, but if they're talking about this ecstasy, I

remember at one point that Mark Treadwell stated that he

bought 22 pills of ecstasy for $60.  So you've got $60 there.

The other drugs, I don't know what he's referring to.

So you have 4260 the way that I see it.

And then the cash distributed to Gipson, you know,

the testimony that I remember from Gipson was the government

asking Ms. Gipson:  "How much money did you get?"

And she said "A thousand."

And then Mr. Franzblau, as he often does, padded and

bolstered, "Are you sure it was only a thousand?"

And she said "1500."

And then Mr. Franzblau became frustrated again and

said, "Are you sure that you didn't get more than that?"

And then she went to 2,000.

And then Mr. Franzblau in his final last ditch

effort, he again upped it one more time; and she said, "No,

no.  It was $2500."

We don't know how much money Ms. Gipson got.  She

never put it in a bank.  So I would just say that anything

with respect to the amount of money that Ms. Gipson got is

speculative, it's speculative, Judge.

And then with respect to the amount intended to take

that day, I don't find any evidence that they intended to take

that, except for some after-the-fact bolstering by Elizondo

1    that said we would have had a good Christmas.  But that was

2    puffing, Judge, by Elizondo.

3         The testimony that I remember from that particular

4    occasion was that Mr. Salgado, my client, found the money.  He

01:43:19    5    took it into his custody, and then he inventoried the money.

6    So to say that they intended to steal that money is

7    speculative, Judge.

8         The only thing that they've proven in my opinion is

9    the $4,200.  That's not speculative.  And that's under the

01:43:38    10    $6500 threshold.

11         Because they can't meet their burden with respect to

12    this particular enhancement, Judge, I think the right finding

13    is that it's 2,000 to 6,500, but nothing more has been proven.

14         THE COURT:  Okay.  What we are going to do is we'll

01:43:58    15    go and talk about everything and then I'll come back and rule

16    at the end.

17         So next would be -- sophisticated means is the thing

18    I ruled on that you are not renewing.

19         So next I guess would be obstruction then.

01:44:15    20         MR. FRANZBLAU:  Well, I think the defense is also

21    opposing the possession of a firearm.

22         THE COURT:  You're right, you're right.  So let's

23    talk about that.  You're right.  I missed that one before.

24         MR. FRANZBLAU:  Judge, this conspiracy involved the

01:44:28    25    abuse of the defendants' police powers to search, detain and

01:44:49

1    arrest in order to rob and steal from people.  Carrying a

2    firearm was a central component of those powers.  It allowed

3    the defendants to secure themselves and also to subdue their

4    victims during these sham raids.  And it was absolutely

5    necessary to give them the opportunity to steal.

6         The evidence showed that the defendants targeted drug

7    dealers because they knew that they carried large amounts of

8    cash.  But, of course, drug dealers also frequently carried

9    guns.  And so the defendants also likewise needed to be armed

01:45:07

10   before they went into these houses to potentially confront

11   these people, subdue them and steal from them in their

12   presence often.

13        We have the *Long* case that for all intents and

14   purposes is directly on point here, where the officers

01:45:24

15   entering a home with intent to steal under the color of law,

16   with firearms readily available - don't need to draw it, don't

17   need to point it, certainly they don't need to shoot it - you

18   just have to have it available, because that's all the force

19   you need to subdue the victims and use the police power in

01:45:43

20   furtherance of the crime in the way that these defendants did.

21   And for that reason the enhancement applies.

22        THE COURT:  Mr. Petro.

23        MR. PETRO:  Judge, I just want to object just

24   briefly.  He's using the word and he's piling on his usual --

01:45:52

25        THE COURT:  Your client is trying to hand you

1    something.

2         MR. PETRO:  He's using the word "defendants" and

3    that's his strategy here.

4         THE COURT:  Your client is trying to hand you

01:46:01    5    something there or Ms. Buican is trying to hand you something.

6    Sorry, I just wanted to make sure you knew.

7         MR. PETRO:  It's not defendants.  We're here to

8    sentence David Salgado.  What is the evidence that David

9    Salgado carried a gun at any time during this conspiracy?

01:46:13   10    There isn't any.  I've looked at all the testimony.  There is

11    no testimony that Salgado --

12         THE COURT:  Is he the only Chicago police officer

13    while on duty who doesn't carry a gun?

14         MR. PETRO:  Well, I don't know, Judge.  But there has

01:46:23   15    to be something other than mere speculation.  These are

16    undercover police officers.  There is a lot of undercover

17    police officers that don't carry weapons.

18         We've looked at every piece of evidence in this case.

19    We've read all the testimony.  We've listened to the experts.

01:46:37   20    We've done all of that, Judge.  And there is not one shred of

21    testimony that my client ever possessed a firearm at any time

22    during this conspiracy.

23         And I know we can make assumptions and things along

24    those lines, but all these people that testified from the

01:46:53   25    Chicago Police Department about policies and procedures and

1    what they're required to do and what they're required not to

2    do, not one person came in here and said that an on-duty

3    police officer has to carry a weapon.  And there is no

4    testimony, there is no evidence that my client ever possessed

01:47:12    5    a firearm.

6           And for that reason, Judge, I would go back to the

7    fact that this is speculative again.  We know and we think

8    from our experience in life that officers carry firearms.  But

9    the government has the burden of proving this particular

01:47:27    10    enhancement and they haven't done it, Judge.

11           THE COURT:  Mr. Franzblau.

12           MR. FRANZBLAU:  Well, even putting aside whether or

13    not Salgado carried a gun, obviously, he did, he's being held

14    accountable for jointly undertaking criminal conduct.  So the

01:47:41    15    fact that Elizondo carried a gun, which I presented

16    photographs of at the last sentencing, he would be on the hook

17    for that.

18           I didn't realize the defense was contesting the fact

19    that Salgado carried a gun during searches.  At trial we

01:47:53    20    presented videos and other evidence that depict him wearing a

21    gun.  I can go downstairs and get them if we need to really

22    make an issue of this.

23           THE COURT:  So the joint responsibility issue, that

24    would fall under the relevant conduct guideline, 1B1.3.

01:48:02    25           MR. FRANZBLAU:  Correct.

1    THE COURT:  What about that, Mr. Petro?  Sorry.  What

2    about that?  So in other words, even if you concede for

3    purposes of discussion that there is no evidence that I'm

4    looking at right at this second here that Mr. Salgado had a

01:48:19    5    gun, he's still accountable because it was jointly undertaken

6    in criminal activity for Mr. Elizondo carrying a gun.

7    MR. PETRO:  Judge, there is no evidence that Officer

8    Elizondo carried a gun.  No one testified that Elizondo had a

9    gun.

01:48:33    10    THE COURT:  There doesn't have to be testimony at

11    trial about it.  I think that's pretty clear.

12    MR. FRANZBLAU:  Judge, we presented photographs at

13    trial that depicted both of them carrying weapons.

14    THE COURT:  All right.  Moving to the next thing

01:48:46    15    would be obstruction then.

16    So, and again, the obstruction enhancement, so it's

17    different from, it's different from Mr. Elizondo's case,

18    because we don't have anything related to testimony.  So what

19    it is here, if I'm understanding correctly, it's the

01:49:05    20    obstruction of which Mr. Salgado was convicted and then

21    applying that to the other counts or not exactly?

22    MR. FRANZBLAU:  It's the underlying conduct of him

23    removing evidence from his home.

24    THE COURT:  Yeah.

01:49:17    25    MR. FRANZBLAU:  Number one.  And then lying to the

1    agents about it.

2              THE COURT:  Okay.

3              MR. FRANZBLAU:  Number two.  So let's, if we go

4    through group by group, I think there is some --

01:49:26    5              THE COURT:  Yeah.  It all, the grouping is sort of

6    the issue here.

7              MR. FRANZBLAU:  There is some confusion because the

8    probation officer is using this terminology "the offense of

9    conviction," also the "object offense."  Let's just put aside

01:49:39   10    "object offense" and talk about offenses of conviction.

11              THE COURT:  Okay.

12              MR. FRANZBLAU:  So group 1 is counts 1, 3 and 5.

13    Number 5 is the false statement.

14              THE COURT:  Okay.

01:49:48   15              MR. FRANZBLAU:  Now, under 3D1.2, application note 5,

16    when an obstruction -- when an offense that is dealt with

17    under 2J1.2 standing on its own is grouped, it should, the

18    first obstruction offense should be grouped with the offenses

19    that it was --

01:50:10   20              THE COURT:  That it relates to essentially.

21              MR. FRANZBLAU:  -- that it relates to.  So that's why

22    we have the 1001 count --

23              THE COURT:  That's why Count 5 is grouped with 1 and

24    2.

01:50:19   25              MR. FRANZBLAU:  -- in group 1, yes.

1    THE COURT:  Okay.

2    MR. FRANZBLAU:  But the act of lying still

3    triggered -- so now we're into 2B1.1, because that's the

4    offense guideline that we're under for group 1.

01:50:32    5    Now we look at the offense enhancements and

6    adjustments that apply under the 2B1.1.  And under 2B1.1,

7    because this conduct is now -- this offense is grouped in, the

8    lying to the agents about returning home and the act of

9    returning home itself was obstructive conduct tied to the

01:50:54    10    group 1 offenses.

11    The reason that *Tankersley*, the case that defendant

12    cites, does not apply here is because we're not counting this

13    under 2J1.2.  You don't apply the 3C1.1 obstruction adjustment

14    under 2J1.2 because it's built into 2J1.2.

01:51:15    15    THE COURT:  It would be double counting basically.

16    MR. FRANZBLAU:  Right.  Here we're at 2B1.1.  It's

17    not dealt with.  So you have to deal with it for the Section 3

18    adjustments.

19    But even if the 1001 count couldn't serve as the

01:51:26    20    basis for the adjustment, the act itself of returning home and

21    removing evidence triggers it for group 1.  And the same

22    arguments go for group 2, that that same conduct applies to

23    group 2.

24    THE COURT:  Okay.

01:51:39    25    MR. FRANZBLAU:  Now, the difference with Elizondo is

1   that Salgado does not get it for the group 3 offense because

2   he didn't obstruct the prosecution or investigation of that

3   offense.

4           THE COURT:  Got it.

01:51:53   5           Okay, Mr. Petro.

6           MR. PETRO:  Judge, I just want to unbundle.

7   Mr. Franzblau is at it again by putting implications on that

8   just weren't proven at trial.  He lied to the FBI about

9   returning home.  To cover the fact that he removed evidence

01:52:07   10  was not proven.  There is nothing in the record that would

11  show that he removed evidence from that particular location.

12          So he lied to the FBI about returning home, which is

13  the conduct specifically in count 5.  And because count 5 is

14  covered by 2J1.2, you're double counting.

01:52:28   15          He should not get two points.  And there is also kind

16  of a gradation there, too.  Elizondo would be receiving a

17  sensational windfall because he testified and he did not tell

18  the truth.  And we pointed out specifically in our motion for

19  new trial what he did to not tell the truth.

01:52:53   20          But to give, well, Officer Salgado an enhancement for

21  count 5 under 2J1.2 and then to give him an obstruction for

22  the exact same conduct, that's double counting, Judge, and

23  that's not permitted.  We cited *Tankersley*.  And *Tankersley* is

24  directly on point.  And what the government can't get around

01:53:16   25  in this particular matter is that he was convicted of this

1    count and 2J1.2 applies.

2        So there is no obstruction by Officer Salgado.  He

3    didn't testify.

4        And the other thing is to remember on count 4, I

01:53:33    5    believe, for Elizondo, he was charged with corruptly

6    influencing David Salgado.  So that's where the two points,

7    the additional two points comes in for him.

8        But with respect to Dave, he was convicted in count 5

9    of obstruction, and that's all he gets.

01:53:55    10       THE COURT:  Okay.  So on the grouping issue, I think

11   it would be helpful to me if you explained your position

12   first, because I want to make sure I have it clearly in mind

13   before I get Mr. Franzblau to respond to it.

14       MR. PETRO:  Well, count 5, Judge, is outside the

01:54:09    15   conspiracy time frame and --

16       THE COURT:  So why does that matter, I guess, is the

17   question.  Why does that matter for purposes of grouping?

18       MR. PETRO:  Well, it was after the fact.  I don't

19   know how that particular act furthered the conspiracy.  So I

01:54:24    20   don't think it should be grouped.

21       THE COURT:  Okay.  Mr. Franzblau.

22       MR. FRANZBLAU:  Judge, first of all, it's not outside

23   the time frame of the conspiracy.  It's an explicit overt act

24   --

01:54:30    25       THE COURT:  It's an over act.

1    MR. FRANZBLAU:  -- written into the conspiracy.  Even
2    if it were though, it's relevant conduct and it still triggers
3    it.
4        The issue here is guideline section 3D1.2,
01:54:43   5    application note 5.  It says the first obstruction offense
6    under 2J1.2 groups, anything more than that doesn't.  That's
7    why count 5 groups and count 7 doesn't.
8        THE COURT:  So the last one then would be role in the
9    offense.  So let me hear from Mr. Franzblau first.
01:55:05   10   MR. FRANZBLAU:  Judge, we are proceeding under an
11   otherwise extensive theory only, not the five or more
12   participant theory.
13       THE COURT:  Okay.
14       MR. FRANZBLAU:  And that is because we didn't end up
01:55:15   15   presenting some evidence that we had initially intended to.
16       So it's based on Elizondo, Salgado, Davis and
17   Gipson's involvement as participants.  But the application
18   notes explain that if in furtherance of offense you basically
19   use the unwitting support of a number of other people, the
01:55:36   20   crime can become otherwise extensive and trigger the four
21   level enhancement.  And that's exactly what we have here.
22       The defendants basically corrupted the entire court
23   system, the entire warrant process in order to carry out their
24   offenses.  It involved duping the States Attorney.  It
01:55:53   25   involved duping judges.  And then it involved duping eight to

1    ten of their fellow officers who were necessary to go out and

2    execute those warrants.

3            And, of course, this didn't just happen once.  It

4    didn't just happen twice.  The Court heard evidence of at

01:56:11    5    least eight different bad warrants where this went on.

6            So under the facts of this case, although there were

7    only four participants, the otherwise extensive prong is

8    triggered.  The four-level enhancement applies.

9            THE COURT:  Mr. Petro.

01:56:25    10           MR. PETRO:  I disagree, Judge.  There is no one that

11   Mr. Salgado supervised.  There is not any testimony that my

12   client supervised.  If he was with people when particular

13   criminal acts happened, well, he was a co-equal with those

14   people.

01:56:43    15           The supervisor, the leader, the organizer in this

16   case was the sergeant, Sergeant Elizondo.  He controlled every

17   portion and facet of the case.  Latonya Gipson was his

18   confidential informant.  He had worked with her for nine

19   years.  Antwan Davis, he had worked with Elizondo since 2008.

01:57:10    20           The other people involved -- and I just want to quote

21   one case here.  "The primary goal of 3B1.1 is to make a common

22   sense judgment about the defendant's relative culpability

23   given his status in the criminal hierarchy."

24           To give Dave four points would put him on the same

01:57:38    25   plane as, again, Officer Elizondo, who was a sergeant, who had

institutional power.

And you had so many people come in here and talk about what the power was of the sergeant in this particular matter. Whatever he said, if he said "Jump," then the answer was "How high do you want me to jump?"

We heard the testimony about how Dave was a follower and they mocked him and called him Little X, some of the team members, because he did what Elizondo told him to do. That's Dave's role in the offense.

Elizondo said "Jump" and Dave said "How high?"

But all of those, there is not one person that came in here and testified that during the course of the conspiracy, that Dave supervised him in any manner. He may have been there at the same time that Elizondo ordered him to be there and some of these particular acts took place, but he didn't manage them. Even when Latonya Gipson did get some cigarettes and some booze for her birthday from Dave, that was at the order of Xavier Elizondo.

The final thing that's insulting about it is you can see what the roles of, the relative roles of the people involved in this case are, Elizondo got up and testified, and so disrespectful is he of Dave that he makes up a lie, that there was marijuana in Dave's house, and that he attributes it to his wife, who is a nurse, who found personal offense and went through the effort to fill out an affidavit about that

1    lie.

2          Sergeant Elizondo did what he did.  He was very, very

3    skilled.  He had been doing this for a long time.  He had been

4    a member of the FBI task force.  We heard all kinds of

5    testimony about how long he had been doing this and that he

6    had a certain amount of charisma that allowed him to do his

7    job.

8          But Dave is -- there is only one driver of this boat,

9    and that's Elizondo.  And everyone else is in the back of the

10   boat doing what Elizondo tells them to do.  That doesn't make

11   you a supervisor.  It makes you a passenger.  It makes you

12   just someone that was there.

13         And if the boat sinks, you can attribute it --

14   because it hits an iceberg, you can attribute it only to one

15   person and that's the captain.

16         And the captain of this particular ship was Elizondo.

17   Dave was just a passenger on that ship.  That's all he was.

18   There is no testimony that he ever exerted any supervisory

19   control over anyone.

20         THE COURT:  So, Mr. Franzblau, can you maybe zero in

21   on the question of supervision and direction, et cetera.

22         MR. FRANZBLAU:  Yeah.  So, Judge, there were several

23   instances at trial in which there was testimony given about

24   Dave actually directing and supervising the informants, the J.

25   Doe informants.  One example was Elizondo told Gipson to go

1    meet with Dave because Dave needed a favor from her.

2            And when Gipson got there, Dave directed her to lie

3    on a search warrant and to get into the home under false

4    circumstances.

02:01:09    5            So that was one instance where David himself was

6    directing the informant to go and lie before a judge.

7            Even if Elizondo, even if it's true that Elizondo --

8    you know, certainly obviously within the Chicago Police

9    Department there was a hierarchy that he was at the top.  That

02:01:27   10    doesn't mean that that hierarchy applied in that offense.

11            I think the evidence at trial showed that they were

12    equals in this conspiracy.  Elizondo tended to have the

13    relationships with the informants.  But they were both clearly

14    directing and driving the ship when it came to taking these

02:01:42   15    people and securing the false warrants, taking these people in

16    front of the judges.

17            But even if Elizondo was above David in the

18    conspiracy, it would still trigger the four level adjustment

19    because David is clearly above the informants themselves,

02:01:59   20    evidenced in part by their testimony.

21            THE COURT:  So I guess my question is why would it

22    be, even taking everything you say as correct, why would it be

23    four levels rather than three?  Organizer/leader as

24    distinguished from manager or supervisor?

02:02:14   25            MR. FRANZBLAU:  I think, Judge, in the

1   manager/supervisor scenario, there is a clearer hierarchy than

2   there was here.  It's often applied, you know, to a gang

3   situation or a drug situation in which there is a clear

4   distribution chain or there is someone who is calling the

02:02:37   5   shots.

6   In this case, the evidence, it's the government's

7   position that the evidence was David and Xavier Elizondo were

8   equals in the conspiracy, and they were at the top of the

9   ladder directing these two people beneath them.

02:02:45   10   The three level enhancement would apply if the

11   evidence showed that it went Elizondo, David beneath Elizondo

12   and the informants beneath David.

13   It's the government's position that it was more the

14   former model than the latter.

02:03:02   15   THE COURT:  Mr. Petro, do you want to make any

16   further comment?

17   MR. PETRO:  It just says in B, Judge, if you look at

18   B for three levels it says "five or more participants."  And

19   the government's conceded --

02:03:11   20   THE COURT:  "Or otherwise extensive," and they are

21   arguing the "otherwise extensive" part of it.

22   MR. PETRO:  Well, I think that Sergeant Elizondo's

23   conduct was extensive, otherwise extensive, but David's was

24   not.  And there has to be some gradation between Elizondo and

02:03:28   25   Salgado.

1    THE COURT:  Okay.

2    MR. FRANZBLAU:  Judge, can I make one more point?

3    MR. PETRO:  But there is just no one that, there is

4  just no one that Dave supervised.

02:03:38    5    THE COURT:  Good.

6    MR. FRANZBLAU:  So not only did Dave play a

7  supervisory role over the informants, but also in the

8  otherwise extensive theory, he's also playing this leadership

9  role where he's putting into action these arms, branches of

02:03:56    10  the court system, basically the unwitting branches of the

11  court system just as much as Elizondo is, and he's effectively

12  manipulating them and exercising control over the unwitting

13  parties.

14    So I think for all of those reasons he is up at the

02:04:11    15  very top at the four level.

16    THE COURT:  Okay.  So let me go back through to each

17  of these, not necessarily in the exact order that they were

18  discussed.

19    So first of all, on the loss amount, the question is

02:04:23    20  whether the loss amount that's established by a preponderance

21  of the evidence gets over $6500.  Everybody agrees that the

22  $4200 from the rental vehicle counts.

23    The primary bone of contention, although not the only

24  one, has to do with the potential proceeds from the Maplewood

02:04:45    25  search.

1    So first of all, I think it was clearly shown that

2 there was an intention to take some of that money had they not

3 discovered the video cameras.

4    The fact that the evidence or at least some of the

02:05:01    5 evidence comes from comments that were made by Mr. Elizondo

6 after the fact doesn't make it any less significant.

7    And I think the tenor of those comments and the

8 evidence indicates that of the 15,000 that was there, it is

9 overwhelmingly likely, and not just a preponderance, that at

02:05:19    10 least 20 percent of that or $3,000 would have been taken and

11 used by the participants in the crime, including Mr. Salgado

12 and Mr. Elizondo.

13    So I think that by itself is more than sufficient to

14 exceed to get the dollar amount over $6500.

02:05:38    15    I agree that there is some play in Ms. Gipson's

16 testimony.  Let's say you take the low amount, the thousand

17 dollars, that still is enough to get over 6500 if you take a

18 relatively modest anticipated skimming off of the proceeds of

19 the Maplewood search.

02:06:00    20    So I think there is enough to get over 6500 by a

21 preponderance of the evidence.  That's the first thing.

22    On the firearm enhancement, so it clearly applies I

23 think.  So I think that it's a reasonable inference from

24 evidence that Mr. Salgado was carrying a gun.  But even if

02:06:25    25 not, there is direct evidence that Mr. Elizondo was and

1   Mr. Salgado is accountable for that under the relevant conduct

2   guideline, which is 1B1.3.

3            The *Long* case, *US versus Long*, which is a 2011

4   Seventh Circuit case, is pretty close and I think governs this

02:06:48   5   case.

6            The defendants were carrying out actions, the

7   defendants in this case were carrying out actions as a police

8   officer which involved making entries into people's homes.

9   The firearm cloaked them with the authority of a police

02:07:02   10  officer.  Even if they didn't take out their guns and wave

11  them around, it was there.  One doesn't know when going into a

12  property that's being searched whether there is going to be

13  people there or not.

14           So there was clearly possession in connection with

02:07:16   15  the offense, because the firearm was there and readily

16  available and cloaked the participants with the authority of a

17  police officer, so that enhancement applies.

18           On obstruction, I think the government has the better

19  of this argument.  I don't think it's double counting given

02:07:37   20  the way it's grouped.  Count 5 is essentially obstruction with

21  regard to counts, I think 1 and 3.  And I think it's both

22  aspects of it.  It's both a lie to the agents and the act of

23  returning home, which the evidence reasonably construed was

24  done to destroy or conceal evidence.

02:07:59   25           This is not double counting.  So it's not really like

1    the *Tankersley* case that was cited.  So I think the Probation

2    Office did the calculation correctly.

3          I also agree with the grouping that was done by

4    Probation.  The defendant's argument is overruled on that.

02:08:13   5          On the role in the offense, so first of all, the

6    criminal activity, it's not whether the two defendants by

7    themselves were otherwise extensive, it's the criminal

8    activity as a whole.  It involved a lot of people beyond the

9    criminal participants.  The criminal participants being

02:08:29   10   Mr. Elizondo, Mr. Salgado, Gipson and Davis.

11         And then there were other people, there were other

12   police officers who had to sign off on the warrant

13   applications, at least in some instances.  There were other

14   police officers who were involved in executing the warrants.

02:08:47   15   There were States Attorneys who were involved in preparing the

16   papers to present to a judge.  There were judges involved in

17   it.  And even assuming that all those people were unwitting

18   participants, which is what the evidence showed, their

19   involvement is enough to make it extensive within the meaning

02:09:09   20   of the guideline.  So that part of it applies.

21         You know, the evidence regarding Mr. Salgado's

22   direction of other people is less than it was with regard to

23   Mr. Elizondo.  And the distinction between the four level and

24   three level enhancement is that the guidelines organizer or

02:09:33   25   leader, that's four levels, versus manager or supervisor.

02:09:49

1        I think there is certainly enough evidence that

2   Mr. Salgado managed or supervised other people, whether they

3   were in one or two instances the other criminal participants

4   or more likely in most of the instances the nonparticipants

5   who were unwittingly involved.

6        I think there is less evidence that he was organizing

7   or leading it.  And we do have this factor here that under

8   just in terms of military rank or whatever, he was outranked

9   by Elizondo.  And there was some evidence that Elizondo told

02:10:07   10   him on various occasions to do this or that.

11        That doesn't make him any less culpable.  But I think

12   for purposes of this enhancement it's the three levels, not

13   the four that applies.

14        So what does that do?  So then you've got to sort of

02:10:20   15   rework everything.  Does that drop the offense level by one or

16   does it end up --

17        MR. FRANZBLAU:  I believe it takes us to 25 and I

18   total.

19        THE COURT:  Okay.  Does that sound right to you,

02:10:31   20   Mr. Petro?

21        MR. PETRO:  I'm sorry, Judge?

22        THE COURT:  So with that finding, does that reduce

23   the overall offense level as recommended by Probation by one

24   to 25?

02:10:39   25        MR. PETRO:  Would I just have -- could I just adjourn

1    just briefly for one second?

2              THE COURT:  Sure.

3              MR. PETRO:  It's complicated.

4              THE COURT:  That's fine.  I am not going to leave,

02:10:46    5    but go ahead and take a minute to do the math.

6         (Pause)

7              MR. PETRO:  Judge, can I just get a clarification,

8    please?

9              THE COURT:  Sure.

02:11:50   10              MR. PETRO:  I thought your ruling indicated that

11   count 5 was grouped with --

12              THE COURT:  I don't know if I got the numbers right

13   or not.  What I concluded was that Probation had grouped the

14   counts correctly.  I may have flubbed the numbers.

02:12:03   15              MR. PETRO:  Thank you, Judge.  Then it would be 23

16   plus 2 would be 25.  That's correct.

17              THE COURT:  So I'm finding that the criminal history

18   category is I.  The offense level is 25.  That means that the

19   advisory range under the sentencing guidelines is 57 months on

02:12:22   20   the low end, 71 months on the high end.

21              So I would like to hear first -- first of all, does

22   anybody have any witnesses that you are planning to call?

23              MR. PETRO:  I do have two witnesses I would like to

24   proffer testimony.

02:12:32   25              THE COURT:  Why don't we do that first.

1      MR. PETRO:  Thank you, sir.

2      THE COURT:  So let's, you know, let's just think

3  about -- I'm sorry, did I miss something?

4      PROBATION OFFICER:  Can I have a minute as well?  I'm

02:12:42   5  getting different math than the parties.

6      THE COURT:  Okay.  Yeah.  So if you are going to

7  huddle, at least do it out of my sight, okay, if you can't

8  huddle.  So just maybe walk over to the side and stand far

9  enough apart from each other.  We can put the white noise

02:13:01  10  machine on.  Actually, no, we're not going to put the white

11  machine on.  You work for the Court.  If you want to talk,

12  talk.

13      (Discussion off the record)

14      THE COURT:  So is it still 25?

02:14:50  15  PROBATION OFFICER:  Yes.

16      THE COURT:  Okay.  So 57 to 71 months is the advisory

17  range.  So I would like to hear first from the government

18  regarding the appropriate sentence, then from defense counsel.

19  I'll give the government to respond to anything you think you

02:15:02  20  need to and then Mr. Salgado gets to talk last.

21      Go ahead, Mr. Franzblau.

22      MR. FRANZBLAU:  Judge, beginning with the nature and

23  circumstances of the offense -- oh, I'm sorry, did you want to

24  do witnesses first?

02:15:21  25      THE COURT:  Oh, witness, I forgot about that.  Let's

|   |   |
|---|---|
| 1 | do them first.  The question is, I think the way to do this, |
| 2 | we'll just have them talk from the podium.  We've got two |
| 3 | podiums, podia.  And so maybe if you want to question, if you |
| 4 | want to stand so that they can see you and you can see them -- |
| 5 | are you going to question them or are they just going to talk? |
| 6 | MR. PETRO:  I'm just going to introduce them for the |
| 7 | record, Judge. |
| 8 | THE COURT:  Fine, okay.  Why don't you do that. |
| 9 | MR. PETRO:  They will proffer a statement and that |
| 10 | will be the end of it. |
| 11 | THE COURT:  That's fine. |
| 12 | MR. PETRO:  I think they will both be reading a |
| 13 | statement. |
| 14 | THE COURT:  Okay.  Who is the first person? |
| 15 | MR. PETRO:  Petra Salgado. |
| 16 | THE COURT:  Ms. Salgado, just come right up to this |
| 17 | podium here. |
| 18 | MS. P. SALGADO:  This one? |
| 19 | THE COURT:  Yes, this one right here. |
| 20 | So what is your name? |
| 21 | MS. P. SALGADO:  Petra Salgado. |
| 22 | THE COURT:  P-E-T-R-A? |
| 23 | MS. P. SALGADO:  Yes. |
| 24 | THE COURT:  All right.  Go ahead. |
| 25 | MS. P. SALGADO:  Okay.  I'm David Salgado's sister. |

02:15:30 (line 5)
02:15:40 (line 10)
02:15:42 (line 15)
02:16:00 (line 20)
02:16:10 (line 25)

1    I'm two years older than David.

2            This is going to take me a while.

3            THE COURT:  I understand.  Just take your time.

4            MS. P. SALGADO:  While we have a close relationship

02:16:36    5    now, growing up, we fought over everything.  We are both

6    strong willed and have hot tempers, which led to some intense

7    arguments.

8            Even though I knew David meant no harm and there was

9    no -- and there was a great person inside.  The David Salgado

02:16:50    10   I know is patient and understanding.  He is someone who tries

11   to do the right thing, tries to be a better person and tries

12   to help those in need as much as he can.

13           David and I along with our other four siblings grew

14   up under rough circumstances.  Our father, who didn't know how

02:17:06    15   to read and write, worked two jobs to feed the family of

16   eight.  As much as our father struggled to provide for us, he

17   managed to put us through college.

18           He was a man with a vision and incredibly strong

19   family values.  He just wanted to see his children succeed in

02:17:24    20   life.  With as much as my father worked to support us, he was

21   not much -- he was not around much.  But that is how he showed

22   us the love and he cared for us and what he provided.

23           Our father passed his strong family values to us.

24   And David wholeheartedly loves his wife Kim and their son

02:17:44    25   Mateo.  Due to the recent events, David has been at home

1  everyday taking care of Mateo.  And their father-son bond has

2  flourished.

3          Mateo means the world to David.  And denying him the

4  privilege of seeing and taking care of him everyday I know

02:18:03    5  will leave a void in not only David's heart, but Mateo as

6  well.

7          It is because of this that I'm standing here today

8  pleading for leniency on behalf of my brother.  I wanted you

9  to hear firsthand from me, because I feel the prosecution

02:18:20    10  painted a picture of a man that is not the brother I know.

11          Since losing our mother unexpectedly in 2017, we have

12  all suffered heartaches, but David really took it the hardest.

13  He fell into a depression and mourned in silence, which only

14  left him feeling angry and anxious.  The loss of our mother

02:18:43    15  took a toll on David.

16          He was left in a vulnerable state, easily influenced,

17  and in a daze that resulted in him going through the motions

18  of life instead of taking an active part in it.

19          It is still hard for me to understand how everything

02:19:01    20  unfolded.  But I understand the seriousness of the situation.

21  Through all of this David continues to believe in higher power

22  and lives with a strong sense of remorse.  Despite everything,

23  he continues to reach out and help the less fortunate.

24          I thank you for your time and I hope you are able to

02:19:22    25  take my heartfelt words into consideration.

1          THE COURT:  Thanks, Ms. Salgado.

2          Any other person, Mr. Petro?

3          MR. PETRO:  Kim, do you want to come up.

4          THE COURT:  You can just stay where you are,

02:19:34   5   Mr. Petro.  You don't have to trudge back and forth.

6          Hi, ma'am.  What is your name?

7          MS. ARREOLA:  Kimberly Arreola.

8          THE COURT:  A-R-R-E-O-L-A?

9          MS. ARREOLA:  Yes.

02:19:44  10          THE COURT:  All right.  Go ahead.

11          MS. ARREOLA:  My name is Kimberly Arreola, and I am

12   writing on behalf of my husband, David Salgado.

13          David and I have been together for seven years.  And

14   we will celebrate our third wedding anniversary this August.

02:19:59  15   We have one child, a seventeen month old named Mateo Elias.

16          For as long as I have known David, he has been

17   nothing short of genuine, selfless, honest, caring and

18   dependable.  He wears his heart on his sleeve a hundred

19   percent of the time all day everyday.

02:20:13  20          David sincerely cares about his family and friends

21   and genuinely enjoys, genuinely enjoys helping others in any

22   capacity.

23          Whenever someone, be it a family member or friend,

24   friend of the family or a friend of a friend needs a helping

02:20:29  25   hand, David is the go-to person.  He never hesitates to help.

He always makes time to be there for others.

I have personally witnessed David's selflessness so many times throughout our time together, it is impossible to share it all in a one-page letter. From keeping water, snacks and clothing handy in his car to pass out to the homeless people when driving around, to saving half a meal or buying an extra meal to give to a local homeless person on the walk back home after a dinner out, to collecting and delivering food, homemade meals, clothing, bedding and toiletries to a group of homeless men in Pilsen, David makes it his job to serve and assist those in need.

Growing up in a neighborhood fraught with gangs, guns and drugs, David experienced firsthand the devastating effects of living in such a community and, quite frankly, was fortunate to make it out alive, unlike his older brother Elias, who was killed in Little Village when David was only nine years old.

Despite the number of hardships outweighing the number of positive opportunities available to him, David managed to prevail. He graduated from high school, earned a bachelor's degree and passed the police test. His intentions have been nothing short of selfless and genuine and have remained as such.

With the arrival of our son Mateo, David's caring selfless nature has shown through exponentially. Watching him

1  take care of Mateo everyday is a constant reminder of just how

2  loving, selfless and dedicated David is.  And I could not have

3  asked for a better father for our son, nor a better partner,

4  best friend, husband or soulmate.

02:22:08

5  Judge Kennelly, my husband David Salgado is a good

6  man, and I can only hope that this letter along with all the

7  others written on his behalf offers you some insight into his

8  actual character.  And I can only pray you will consider my

9  comments in making a fair sentence for David.  Thank you.

02:22:24

10  THE COURT:  Thanks, Ms. Arreola.

11  Okay.  Mr. Franzblau, you can go ahead.

12  MR. FRANZBLAU:  Thank you, Judge.

13  Judge, like last time, I'm going to talk about why

14  the guidelines do not capture the seriousness of this offense.

02:22:40

15  The driving guideline here is for count 2, the civil

16  rights conspiracy.  And the guideline, for reasons I lay out

17  in detail in my memo, does not capture the nature of this

18  conspiracy because it does not account for the multiple

19  underlying offenses involved in the civil rights conspiracy.

02:23:00

20  Your Honor has heard evidence of at least eight bad

21  searches that these defendants were involved in.  But this

22  guideline punishes them the same as if they had only done it

23  once.

24  But this, of course, was no one-off mistake.  This

02:23:14

25  was repeat, continuous conduct by thoroughly corrupt police

1    officers over a period of seven months.  The guidelines don't

2    capture it.

3         The guidelines do not capture the joint nature of the

4    conduct and the particularly pernicious dynamic we had in this

02:23:29    5    case between a corrupt supervisor and a corrupt line officer

6    and the way that they used that dynamic to work the system,

7    where Elizondo would sign off on these bogus warrants that

8    Salgado was typing up.

9         So the first line of defense was corrupted.  And

02:23:47    10   after that, of course, they didn't have immediate supervision

11   on the ground and when it was going on.  So that again made

12   this particularly damaging and difficult to detect within the

13   CPD.  The guidelines don't capture it, but the sentence must

14   reflect it.

02:24:02    15        It does not, the guidelines do not capture the

16   extraordinary public and institutional harm caused by these

17   defendants' corruption.  Not only were there several

18   individual victims who had their doors kicked down in their

19   homes, invaded wrongfully, but we had the defendants again

02:24:25    20   hijacking the court system and turning it into an

21   instrumentality of their crimes.

22        And as Your Honor said, that's why people don't trust

23   the system.  That's why people don't trust law enforcement.

24   They corrupted the whole warrant process, one of our core

02:24:44    25   constitutional protections that makes, gives meaning to the

1    word living in a free society.  That was taken away in a

2    meaningful way for an entire area of this city.  The

3    guidelines don't reflect it, the punishment must.

4         The guidelines do not reflect the damage caused to

02:25:02    5    Mark Treadwell, the extraordinary corruption involved in

6    falsifying a police report that led to the denial, the false

7    imprisonment of this man for over four months.  It takes this

8    case into a categorically different level of seriousness.

9    It's not reflected in any way in the guidelines, it must be in

02:25:24    10   the punishment.

11        Your Honor, it's the government's position that the

12   defendant David Salgado should receive the same punishment as

13   Elizondo.  And the reason for that is that, you know, for all

14   intents and purposes, the offense and relevant conduct was

02:25:41    15   mostly the same.  From the government's standpoint, they are

16   equally culpable.  But each one had a uniquely aggravating

17   factor that the other did not or to the same extent as the

18   other.

19        For Elizondo, it was the perjury that went on at

02:25:57    20   trial.  For Salgado, it was the high levels of drug

21   distribution.  A police officer out on the street doling out

22   narcotics to drug addled and addicted people, dangling

23   narcotics in front of them in order to manipulate them, it is

24   outrageous, it is arguably far more serious than Elizondo's

02:26:20    25   perjury.

1    You heard evidence at trial that Salgado distributed

2  20 to 25 pills of ecstasy to Antwan Davis.  That was

3  corroborated in several ways, including the fact that we

4  showed that that was the one thing that was not photographed

02:26:32    5  during the search were those missing ecstasy pills.

6    You heard that Salgado distributed a bag of marijuana

7  to Gipson.  That was corroborated on several different fronts.

8  You heard testimony from two different officers who saw

9  Salgado remove marijuana from the evidence room shortly before

02:26:52   10  these drugs were distributed, packaged in the exact same way

11  that Gipson described it, in a little sandwich baggie.

12    We also showed you GPS information and text message

13  exchanges that show, in fact, Salgado did meet with her that

14  day in the parking lot and gave her not only a bottle of

02:27:10   15  alcohol but a bag of marijuana.

16    And then, Judge, you heard at sentencing from Jacob

17  Hochgraver.  And this I think is the most serious conduct.

18  Hochgraver testified that on at least a dozen occasions the

19  defendant gave him heroin.  This is a man who is suffering

02:27:32   20  from a disease, a sickness, and he's got a police officer

21  feeding that disease.

22    The police officer on one hand is using him to get

23  drugs from another, from certain parties, and then he's just

24  simply transferring it to someone else.  I think Hochgraver

02:27:46   25  described it best when he said it was outrageous.  It was like

1    Training Day.  It was like nothing he had ever seen before.

2    It was surreal the level of corruption that was going on.

3           Hochgraver's testimony was detailed, it was credible

4    and it was corroborated by independent evidence, namely,

02:28:02    5    Government Exhibit Hochgraver Text Messages, the text messages

6    were recovered from Salgado's phone in which he's

7    communicating with Hochgraver about these text messages.  And

8    it's clear from the way that Hochgraver speaks to the

9    defendant that their relationship was exactly as Hochgraver

02:28:20    10   described it.

11          If Hochgraver was willing to lie and get him into a

12   house that he shouldn't have been going into after cutting

13   these corners, Salgado would give up whatever goods he found

14   inside.  Hochgraver says on page 3 of this text message

02:28:35    15   exhibit, "I will also give up Dave's, a target's cousin

16   tonight.  But I want all his dope and money he has on him."

17          Now, obviously, a person on the street is not going

18   to demand dope and money seized in a house from a police

19   officer, unless he knows he can safely make that demand,

02:28:55    20   unless he knows he's dealing with a thoroughly corrupt police

21   officer.  And that, of course, is exactly what we have here.

22          Now, unlike Elizondo, Salgado's uniquely aggravating

23   conduct is not captured in any way in the guidelines.

24   Elizondo got the obstruction bump.  Salgado, there is nothing

02:29:19    25   in the guidelines that account for his drug distribution.  And

1   I would argue that it is more serious.  It's as outrageous and

2   ridiculous as that perjury was.  For a police officer to be

3   out on the street distributing narcotics, it is even more

4   serious and it demands an even firmer punishment.

02:29:34   5          Your Honor, I also want to address this idea that

6   Salgado, this sort of Nuremberg defense, if you will, that

7   Salgado was simply following orders.  That does -- that just

8   doesn't cut it here.  The defendant cannot just blame

9   Elizondo.

02:29:51   10          Salgado had been on the police force for 14 years

11   before he was paired with Elizondo.  This was not a situation

12   in which Elizondo was manipulating some green, newbie officer

13   who didn't know the ropes.  Salgado was experienced.  He had

14   been around the block.  He should have been able to say no.

02:30:11   15          In fact, every argument that the defendant makes

16   about all of the time that Salgado spent on the force and all

17   the good things he did before he became corrupt you should

18   also look at as all the reasons he should have been able to

19   say no.  His will was not overborne.  He wasn't tricked.  He

02:30:29   20   wasn't manipulated.  He was thoroughly corrupt because he

21   chose to be.

22          And we know that he was corrupt before he was paired

23   with Elizondo.  And with all due respect to his family members

24   and the hardship that he's gone through, he was corrupted

02:30:45   25   before the passage of his mother and his parents.

1       Hochgraver was testifying about conduct that took

2  place in 2016, way before this conspiracy. Salgado was having

3  Hochgraver lie on warrants and doling out drugs. The charged

4  conspiracy was just a continuation of a long pattern of

02:31:04    5  criminal conduct that had already took place. He broke bad

6  before he met Elizondo. He can't now turn around and point

7  the finger at him.

8       You know, Judge, my heart goes out to Salgado's

9  family. Clearly, there is a lot of good about him. I wish I

02:31:27   10  had made more of a point of this for defendant Elizondo. He's

11  obviously a good father, a good family member, a good friend.

12       There is rarely a situation, as you know better than

13  I do, where a defendant, someone who has committed a crime, I

14  mean, they're still human beings, there is rarely a situation

02:31:44   15  where they're all bad.

16       And we're not here to say that he's led a bad life,

17  that he's anything other than what has been proven against him

18  at trial, that he committed these acts. But, you know, as

19  citizens, we all owe obligations beyond our immediate family

02:31:57   20  members and our friends.

21       And as police officers, the defendants owed

22  extraordinary obligations and carry extraordinary

23  responsibilities and duties that they owed to the public, and

24  they failed again and again and again. They betrayed that

02:32:17   25  trust.

02:32:32

1       So regardless of how he's lived his life - and I'm
2   not here to argue about that, you should certainly weigh it to
3   the extent it's mitigating - but we are here to punish the
4   extraordinary breach in the public trust that took place in
5   this case.

6       And considering the length, the manner, the
7   continuous nature, and especially the particularly aggravating
8   nature of the drug distribution, of standing out on the street
9   and handing out heroin to drug-addicted people, who need the

02:32:50

10  help of the police, not the complicity, not being an
11  accomplice, he deserves to go away as long as Elizondo.

12      THE COURT:  Thanks, Mr. Franzblau.

13      Mr. Petro.

14      MR. PETRO:  Judge, I just want to comment on a few

02:33:07

15  things.

16      The 25 pills that allegedly Antwan Davis received,
17  the ecstasy pills, it's corroborated by everything except for
18  the grand jury statement that was prepared by Mr. Franzblau.
19  We all remember about how when he went to the grand jury and

02:33:23

20  he testified under oath, he told Mr. Franzblau, and
21  Mr. Franzblau must have believed him.

22      And then he testified that it was Elizondo that gave
23  him the pills.  And then as we move closer to trial, there was
24  this meeting between Mr. Davis and Mr. Franzblau where

02:33:40

25  miraculously that testimony was changed, and now Salgado was

1    the purveyor of these drugs to Antwan Davis.

2         And we remember Antwan Davis' testimony, that when

3    the government asked him a question, he had an answer.  He had

4    prepared an answer.  But when the defense attorneys asked him

02:33:58    5    a question, he said that he didn't remember or he didn't know.

6         But the only thing that doesn't corroborate that Dave

7    gave these pills to Antwan Davis is the grand jury statement

8    of that gentleman there.  And it's outrageous.  That's

9    outrageous.

02:34:20    10        Gipson received this marijuana that he talks about.

11   Latonya Gipson testified thoroughly that she smoked whatever

12   was given to her and she didn't get high, that she did not

13   feel the effects that she familiarized with marijuana.

14        So as far as that particular drug, I have no idea.

02:34:43    15   Latonya Gipson, who was an expert on just about every drug

16   that's manufactured, testified that she didn't get high on

17   whatever it was that Dave gave her.  So that leaves Dave with

18   giving her cigarettes and alcohol.

19        Mr. Hochgraver never complained.  Mr. Hochgraver was

02:35:06    20   a shakedown artist.  Mr. Hochgraver, who alleges that Dave

21   gave him all this heroin, never told anyone about this.  And

22   we know that he had access.  He was also working for the

23   Tinley Park Police Department as a confidential informant and

24   being paid per transaction $40 per transaction.  And then he

02:35:27    25   was also working for the Orland Park Police Department being

1    paid somewhere in that same range.

2         There is absolutely nothing to support Hochgraver's

3    drug-addled brain, nothing.  And that's why he wasn't called

4    at trial.

02:35:46    5         The thing that I find most amazing about this case is

6    that all these experts that came on, Sean Martin and all these

7    people from the Chicago Police Department came on, and there

8    was never any ability, all these orders that exist, and the

9    experts that work for the Chicago Police Department said:

02:36:05    10   Look, there is no order related to confidential informants.

11   There is no order that specifically states that confidential

12   informants can't be paid.

13        I asked one of them:  Is there any training on this

14   particular aspect?

02:36:20    15        There is no training.  The command structure was

16   responsible for ensuring proper practice.

17        There is no database for registered or unregistered

18   informants.

19        Dave was at the mercy of Xavier Elizondo.  He was the

02:36:43    20   command structure on these search warrants.  Should Dave have

21   been able to say no?  Well, the hardest part about law

22   enforcement or being a lawyer is that we can do our jobs, all

23   of us can do our jobs.  They're high stress.  But when you

24   combined social things, the death of a loved one or the death

02:37:05    25   of a parent, and the difficulty of the job, you know, the job

1  makes these officers sick.  That's the truth, Judge.  And the

2  only vacation they get is found at the bottom of a bottle of

3  whiskey or vodka or something along those lines.

4         And it's easy to say that anyone should have been

02:37:29    5  able to say no.  But when you overwhelm someone with the job,

6  the job of being a police officer in 2018 in Chicago, I think

7  if you tested every police officer in the city of Chicago

8  during that time, Judge, had Post-Traumatic Stress Disorder at

9  some level.  And most of them were self-medicating.

02:37:49    10         There is nowhere to go to get away from the job

11  except to the local bar to drown your sorrows with some

12  alcohol.

13         So what do I think in the end?  And Dave is going to

14  make an allocution and tell you, Judge.  But I would like to

02:38:09    15  say that it has to be sufficient but not greater than

16  necessary, the sentence.

17         And what is that number?  And you have to take into

18  account if the sentencing guidelines don't capture something,

19  right now they're saying that Elizondo and Salgado are the

02:38:32    20  same.  And that's an absolutely outrageous argument.  Elizondo

21  was the command structure.  That's worth 20 months.

22         Elizondo also got up and lied and lied and lied and

23  lied.  And you can imagine what it's like to go to work every

24  day for someone like that where you have to flip a coin to

02:38:58    25  determine whether or not he's telling the truth or not telling

the truth.  He certainly had a reputation.  He had the people

on the street.  People lucked up to him.  He's a guy going

places.  He threw around the fact that he was on an FBI task

force with his team members.  And he threw it around in here

in court, too.

And you can see what kind of monster this guy is.

How would you like him to be your boss?  Even when he's put

under oath in courtroom, he still can't tell the truth.

And to show you what kind of person he is, he

actually lied and said that my client's wife used and

possessed marijuana.  And we provided her -- and she's

shocked, dismayed, disheartened that someone would say that

about her.

His testimony is worth 20 months, Judge.  The number

is 37 months.  That is sufficient but not greater than

necessary.

And we can look at specific deterrence.  Is there

specific deterrence here?  Yeah.  He lost his job.  Salgado

lost his pension, Judge.  He loses the stream of income.

Elizondo is going to get his pension for the rest of his life.

Salgado doesn't.  Is that punishment?  It's a grave

punishment.  He would be four years from retirement at this

time, Judge.  It's a substantial punishment.

But being a guy, being Little X and following rules,

you know, it's a shame what's happened here, Judge.

1    I think 37 months -- he's got a young son.  You've

2  read the letters.  He's hard working.  He's gotten awards that

3  he had perfect attendance for year after year after year.  But

4  he's a hard-working person.  He'll do anything for anyone.  He

02:41:00    5  is dedicated to his community.  He was happy about being a

6  Chicago police officer because he wanted to help people,

7  Judge.

8    And I think considering all those things, I think 37

9  months is the right number.

02:41:17    10    THE COURT:  Did you have any comments on any of the

11  supervised release conditions that were proposed?

12    MR. PETRO:  No, Judge.  No objection.

13    THE COURT:  I forgot to ask Mr. Franzblau that.

14    So, Mr. Franzblau, is there anything you want to

02:41:29    15  reply to what Mr. Petro said?  Include anything you want to

16  say about supervised release.

17    MR. FRANZBLAU:  No to both, Judge.

18    THE COURT:  Okay.  Mr. Salgado, you have the right to

19  tell me anything you would like to before I sentence you.  If

02:41:40    20  you want to come up here, that's fine.  If you want do to it

21  from there, that's fine.  It's your choice.

22    THE DEFENDANT:  Okay.  I'll most likely stay here.

23    THE COURT:  Okay.  Pull the mic.

24    If you want to come up here, yeah, that's fine.

02:42:00    25  Okay.  Go ahead.

1          THE DEFENDANT:  Judge Kennelly, first of all, I want

2     to thank you for giving me the opportunity to address the

3     Court.

4          And I would like to start by telling you a little bit

02:42:08    5     about myself.  I am the youngest of six children, the only one

6     born here in the United States.

7          I was raised in the south side of Chicago,

8     particularly in the Pilsen, Little Village, two neighborhoods

9     that are still and are infested with gangs, drugs and crime.

02:42:28   10          When I was young, I witnessed my mom being robbed,

11     experienced a burglary in process as we walked into our

12     apartment as the burglar was running out.

13          While living in Little Village, my brother was killed

14     as a result of gang violence.  And my sister was sexually

02:42:50   15     abused during the commission of yet another home

16     invasion/burglary.

17          I was pressured in the worst times to joined gangs,

18     but I would always refuse, knowing that this would lead to

19     being harassed and getting beat up, as I typically did.

02:43:07   20          I avoided the violence of the neighborhoods by

21     joining after-school programs, programs like the Boys and

22     Girls Club of Chicago, the Chicago Police Explorers Program.

23     Participating in the Chicago Police Explorers Program was one

24     of the main experiences that interested me in law enforcement.

02:43:29   25          After completing high school, I attended Richard J.

1   Daley College, where I was earned -- where I earned an

2   associate's degree and continued my education at Saint Xavier

3   University, earning a bachelor's degree.

4           I applied for and was accepted into the Chicago

02:43:46   5   Police Academy in August 25th, 2003.  I entered the Police

6   Academy, where I was taught about rank and file, law and

7   numerous use of force tactics.

8           After graduating from the academy, I was assigned to

9   the 10th District Police Station, which is an area in which I

02:44:06   10   grew up.  I was very happy with this assignment as it allowed

11   me to serve my childhood community.

12           I worked hard for 14-plus years, never taking a day

13   off.  I received numerous awards for my work ethic from

14   various supervisors under which I worked.

02:44:22   15           Any time I had the opportunity I would volunteer to

16   speak to youth programs and elementary schools about the

17   negative effects of gangs and drugs.

18           Whether on duty or off duty, I would also tend to the

19   homeless community, which I still do now, by taking them food,

02:44:43   20   clothes or giving an opportunity to call their loved ones

21   using my personal cellphone.  These homeless people are

22   immigrants from different parts of Latin America.

23           After my mother passed away in March of 2017, I

24   became very depressed.  I began to drink heavily, almost every

02:45:01   25   day to numb my pain and ease, ease the hurt I was feeling.

1    Not even my wife knew that I was doing this because I hid it

2    so well.

3              At this time I also lost the passion of going to

4    work.  This happened around the same time Sergeant Xavier

02:45:23    5    Elizondo took over as my supervisor.

6              Like every supervisor I had worked for, I respected

7    and trusted him.  I, like all police officers that come out of

8    the academy, was taught to follow orders from your supervisor

9    because they are there to protect you, not hurt you.

02:45:37   10              After working on his team for a short amount of time,

11    I had confidence in Sergeant Elizondo's leadership as he had a

12    broad knowledge base regarding gangs and gang structure and

13    extensive experience working for specialized units and task

14    force created by the Chicago Police Department.

02:46:01   15              During the time Sergeant Elizondo was my supervisor,

16    he pushed me and other team members to prepare search warrants

17    using information he received from his personal informants,

18    informants that he would only handle in an attempt to gain

19    high numbers of activity to appease the higher rank and file.

02:46:19   20              Always believing information provided to us by our

21    supervisor was true and accurate, my team members and I would

22    prepare warrants as ordered.  Due to my strong work ethic, I

23    believed that the rank and file -- I believed in the rank and

24    file.

02:46:34   25              I would follow orders, prepare search warrants as

1    instructed, which made me an easy target for taunting by

2    others members on my team.  Just like with previous teams and

3    supervisors, my team dubbed me Little X.  With previous

4    supervisors I had been called Little Ferrar, Little J and et

02:46:50    5    cetera.  Whatever supervisor I was working for, I would get

6    picked on, and they would use the term "little" with the

7    supervisor's name.

8         Standing here today I feel ashamed and embarrassed,

9    disgraced, ashamed that I allowed myself to just throw the

02:47:06    10   motions at work and blindly following orders from my

11   supervisor, embarrassed that I brought the shame, heartache to

12   my family, especially after all the loss we have recently

13   suffered, the passing of my father in February of 2018, when

14   all this happened; disgraced that after all the years and

02:47:28    15   years of dedication I sacrificed, I gave the city to serve and

16   protect, I have not only lost my identity, but I will lose my

17   job and I will lose my pension as well.

18        Through all this hardship my family and I have

19   endured in the few, in the last few years, my wife and I have

02:47:48    20   been blessed with the arrival of our son Mateo Elias.

21        I've become a new father for the first time.  And

22   more recently -- I'm sorry, Your Honor.  And more recently,

23   still I found the comfort in the little joys of life, Mateo's

24   laugh, the pitter patter of his feet as he runs through the

02:48:26    25   house, and hearing his small voice call from da da.

02:48:45

1    It is because of this, Your Honor, that I humbly ask

2    for leniency of the Court, from the Court.  Becoming a husband

3    and a new father has been challenging in so many ways.  And I

4    can only pray, I can only pray you grant me the privilege of

5    being present in my son's life and allow me to be there to

6    raise him alongside my wife.

7    I appreciate your thoughtful consideration while

8    making your decision, Your Honor.  Thank you very much.

9    THE COURT:  Thank you, Mr. Salgado.

02:49:00

10    Okay.  So first of all, I need to start with the

11    crimes here, which were quite severe.  They involved

12    corrupting the court system, corrupting public officers,

13    violating the law, violating the constitution, stealing from

14    people, in some instances distributing drugs, passing out

02:49:37

15    money to people to lie.  You really can't minimize how

16    extraordinarily serious the crimes were that were committed

17    here.  They're very serious offenses that merit significant

18    sanction.

19    It was Mr. Salgado's sister that made the comment,

02:50:08

20    she thought that at the trial, I wrote down her words, painted

21    a picture of a man that was different from the person I know.

22    It's probably right.  I mean, I can't disagree with

23    that at all.  I mean, you know, at trials you don't get a

24    picture painted of the full person.  That's not what a trial

02:50:31

25    is for.  A trial is an exercise to determine whether there is

1    evidence that proves a person's guilt of a crime.

2            And the evidence that gets presented by the

3    prosecution to prove that, it isn't evidence about the whole

4    person, it's about what they did and what they intended and so

5    on.  And so that's why the trial is a picture of somebody

6    different from, you know, family members or friends know.

7            It's at sentencing that you get a more complete

8    picture.  And that's why, you know, sentencing is kind of a

9    wide-open proceeding where pretty much anything can be

10   submitted.

11           And so I'm not going to say and I wouldn't hesitate

12   to say about pretty much any defendant, maybe with some

13   exceptions, that they're evil people.  And I certainly don't

14   think Mr. Salgado is an evil person or anything close to it.

15   I think he's a good person.  That's shown by the letters that

16   were submitted.  That's shown by his actions.  That's shown by

17   the commendations he got.  That's shown by his diligent

18   service.

19           And, you know, taking what Mr. Salgado just said a

20   second ago and what his family members said, you know, he

21   became a police officer for good and honorable reasons it

22   seems like to, you know, protect the community and help other

23   people and did quite a bit of that.  I have no doubt about

24   that.

25           At some point though something else started

happening.  And I can't pinpoint exactly where it happened.

And at some point, Mr. Salgado, this other side emerged.  He

became maybe slowly but surely but ultimately maybe while he

was doing good things and also became corrupt, and there is

02:52:26    just no question about that.

You know, a second ago Mr. Salgado I think was

basically trying to tell me, "I believed everything that the

informants were saying.  I believed everything Mr. Elizondo

told me."  It's just not a believable proposition.

02:52:42    I mean, the most charitable way I can characterize it

is he decided to look the other way and go along.  I think

that's overly charitable.  I think it's way worse than that.

But the proposition that Mr. Salgado is just an unwitting

participant in somebody else's crime is just not a viable

02:53:06    proposition by any stretch of anybody's legitimate

imagination.

And this isn't a case about not complying with

Chicago Police Department rules about, you know, paying

informants or detailing it or writing it up and things like

02:53:24    that.  It's a case about causing other people to lie for

personal gain and corrupting the system for personal gain.

So, you know, as a person who is called upon to

impose a sentence, I'm faced with the same question that I

have to deal with in many, many cases is:  Why does a

02:53:44    basically good person do bad things?

1      And, you know, there is no way for me to provide an

2 answer to that.  I can, I can maybe, you know, make educated

3 guesses at it, semi-educated guesses.

4      I mean, I think that there is a decent chance that

5 what was going on here is that, you know, Mr. Salgado along

6 with Mr. Elizondo figured, well, you know, if we're taking

7 drugs and money from drug dealers, who cares?  They're bad

8 people.  They don't matter.

9      And if we, if we, you know, have to give a little bit

10 of weed or some ecstasy on the side to somebody, it's okay,

11 they don't matter either.  You know, it's something they would

12 be doing anyway.

13      I mean, at a certain level it involves a level of

14 dehumanization of the people that you are responsible for in

15 the final analysis.

16      I don't think that Mr. -- I think the comment was

17 made, maybe by Mr. Petro, that Mr. Salgado was at the mercy of

18 Mr. Elizondo.  I just can't buy that.  The evidence doesn't

19 show it and I can't buy it.

20      He could have said "No."  He could have said "I'm

21 tired of being in this unit."  He could have asked to be

22 reassigned.  Nobody put a gun to his head or anything close to

23 it and forced him to work with this guy that he says was

24 leading him down this path.

25      So he wasn't at the mercy of anyone.  Mr. Salgado

02:55:37

1  made choices, and now this is where he finds himself.  And

2  it's a sad situation any time that you have, you know, a

3  basically good person that's a good family person, you know,

4  grew up with a good family and has a good family, that they're

5  in this position that they now have to pay a price for

6  something very bad that they did.  But this is where we are.

02:56:06

7  The crime is severe because it's part of many things

8  that corrode the trust of the public.  People look at things

9  like this and they say:  These people, I guess they just don't

10  follow the rules.  They don't have to follow rules.  They

11  don't think they have to follow the rules.

02:56:19

12  And ultimately when that gets believed on a

13  widespread basis, there is no trust left.  And without trust,

14  the system doesn't work.  The system just doesn't work.  We're

15  seeing that.

16  I'm not saying Mr. Salgado is directly responsible

17  for any of it, but, you know, you see what happens when people

18  don't trust the system.

02:56:34

19  And Mr. Salgado was one of many, many aspects of

20  that, but he was certainly one of them.  And it was a matter

21  of choice, not having the wool pulled over his eyes or being

22  forced or anything like that.

23  So to deal with some of the arguments that were made,

24  I think as I said in Mr. Elizondo's sentencing, I do think the

02:56:56

25  government has a viable point when they say that the

1    sentencing guidelines range does not completely capture the

2    severity of what happened here.  Mr. Franzblau explained that

3    quite well, and I can't really improve on it.  There are

4    things on the other side.  There is the positive aspects of

02:57:16    5    Mr. Salgado's life and his career that I've mentioned.

6         There is also the other consequences of this.  As

7    Mr. Petro has pointed out and family members, he's lost his

8    job.  He's lost his pension.  You know, it has a serious

9    effect on his family.  You know, police officers in prison,

02:57:39    10    it's not a great thing.

11         I think as I did in Mr. Elizondo's case, that those

12    factors essentially balance each other out.  On the one hand,

13    the guidelines not completely capturing everything, and on the

14    other hand the other factors that I just noted.

02:57:56    15         So let me start with the supervised release

16    conditions.  First of all, the period of supervised release is

17    going to be one year.  It's going to include all of the

18    conditions that were recommended by Probation, which there

19    haven't been any objected to.

02:58:08    20         Mr. Petro, as you know, I have to read them out loud,

21    unless Mr. Elizondo -- or Mr. Salgado, excuse me --

22    Mr. Salgado tells me that I don't have to read them out loud.

23    Do I need to read the supervised release conditions that were

24    in the presentence report out loud?

02:58:23    25         (Discussion off the record with defendant)

1         MR. PETRO:  No, Judge.

2         THE COURT:  All right.  So those will be the

3  conditions.  The restitution I believe is $4,200.

4         MR. FRANZBLAU:  Correct.

02:58:31    5         THE COURT:  And it's payable to -- well, we'll get

6  that figured out.

7         The special assessment is -- I've got to look.

8         MR. FRANZBLAU:  $500.

9         THE COURT:  $500, there is 100 each on five counts,

02:58:45   10  total of 500.

11         I'm waiving interest on the restitution.

12         I'm not imposing or I'm waiving cost of imprisonment

13  and cost of incarceration.

14         So in terms of the sentence, I don't -- I get the

02:59:03   15  arguments that are made for -- and so first of all, let me

16  first say that the government argued for a significantly

17  higher sentence for Mr. Elizondo than I imposed and would have

18  been arguing for that same sentence as I understand it from

19  the memorandum for Mr. Salgado too and now is arguing for the

02:59:20   20  same sentence that I actually imposed on Mr. Elizondo, which

21  was 87 months, so 7 years and 3 months.

22         I understand the government's argument about the sort

23  of the unique things that it's contended that Mr. Salgado did.

24  On the other hand, those are things that Mr. Elizondo was also

02:59:40   25  accountable for.

02:59:52

1    Mr. Salgado is not accountable for the one very

2 significant thing that Mr. Elizondo did, which was lie on the

3 witness stand.  He wasn't accountable for that at all.  He

4 didn't have anything to do with it.  So I don't think they

5 merit the same sentence.

6    I am going to impose, as I did with Mr. Elizondo, a

7 sentence at the high end of the guideline range, because I

8 think that adequately captures the conduct and the mitigating

9 factors.

03:00:02

10    So the sentence will be, so on counts 1 and 5, it's

11 60 months, because that's the maximum.  On counts 2, 3 and 7,

12 it's 71 months, which is the high end of the guideline range.

13 And those are all concurrent.  So the total sentence is 71

14 months.  As I said, the term of supervised release is a year

03:00:26

15 on each of the counts to run concurrently.

16    Before I advise Mr. Salgado his appellate rights, are

17 there any other issues that you'd like to bring up or anything

18 you think I overlooked, Mr. Petro?

19    MR. PETRO:  Judge, I would just ask for the

03:00:38

20 Residential Drug Abuse Program.

21    THE COURT:  Yes, that's clearly merited.  And I am

22 going to recommend given what is disclosed in the presentence

23 report that Mr. Salgado be designated to an institution where

24 he can participate in the Residential Drug and Alcohol Abuse

03:00:51

25 Program at an appropriate point during his term of

1    incarceration.

2           MR. PETRO:  He would like to serve his sentence at

3    Oxford in Wisconsin, please.

4           THE COURT:  Recommend FPC Oxford because it's close

03:01:04    5    to Chicago, and it's important for Mr. Salgado to remain in

6    contact with his family and vice versa.

7           Anything else you can think of?

8           And I'm going to set a surrender date.  If you want

9    to make the argument, go ahead.

03:01:15    10          MR. FRANZBLAU:  Judge, just a technical point on

11   restitution.  He's jointly and severally liable.

12          THE COURT:  Jointly and severally liable with

13   Mr. Elizondo.  Thanks for reminding me of that.  That's true.

14          Okay.  So Mr. Salgado, you have the right to appeal.

03:01:26    15   To do that, you would have to file a notice of appeal with the

16   Clerk of this Court.  You would have to do that within 14 days

17   after the judgment gets entered.  If you want to appeal, you

18   should tell Mr. Petro or Ms. Buican.  They know what to do.

19          If you couldn't afford the filing fee for an appeal,

03:01:40    20   the cost of court hearing transcripts, the trial transcript,

21   or the cost of an attorney and could show that, that would be

22   provided without any cost to you.

23          Do you understand all that?

24          THE DEFENDANT:  Yes, sir.

03:01:47    25          THE COURT:  Okay.  So I'm going to set a surrender

1   date basically like about four months out.  I'm going to say,

2   let's say December, it's a little bit more than four months,

3   but December 2nd at whatever institution is designated by the

4   Bureau of Prisons.

03:02:05   5        MR. FRANZBLAU:  Judge, just to make a record.

6        THE COURT:  Yes.

7        MR. FRANZBLAU:  Normally I would ask you to take him

8   into custody now.  But since you did not for Elizondo --

9        THE COURT:  I would deny it for the same reason if

03:02:15   10  you asked, yes.

11       MR. FRANZBLAU:  -- I wish he be treated equally.

12  Thanks.

13       THE COURT:  Okay.  We're in recess.

14       (Proceedings concluded)

15            C E R T I F I C A T E

16       I, Jennifer S. Costales, do hereby certify that the

17  foregoing is a complete, true, and accurate transcript of the

18  proceedings had in the above-entitled case before the

19  Honorable MATTHEW F. KENNELLY, one of the judges of said

20  Court, at Chicago, Illinois, on July 15, 2020.

21

22            */s/ Jennifer Costales, CRR, RMR*

23            Official Court Reporter

24            United States District Court

25            Northern District of Illinois